ENGLE v. MANCHESTER & SPOONER.

SAME v. MANCHESTER (two cases).

(Court of Appeals of District of Columbia. Submitted November 14, 1919.
Decided January 5, 1920.)

Nos. 1262–1264.

PATENTS �köm91(4)—EVIDENCE SUSTAINS SENIOR PARTY IN INTERFERENCE PRO-
CEEDINGS.

In patent interference proceedings over an electric battery, evidence re-
garding the junior party's acquiescence in statements that the senior party
was the inventor, etc., *held* to establish, contrary to the Assistant Com-
missioner's decision, that the senior party was entitled to priority.

Appeal from a Decision by the Assistant Commissioner of Patents.

Patent interference proceeding between George S. Engle and Man-
chester & Spooner, and two similar proceedings between George S.
Engle and Arthur P. Manchester. From a decision awarding priority
to the junior parties, George S. Engle appeals. Reversed.

Vernon E. Hodges, of Washington, D. C., for appellant.

A. S. Steuart and Melville Church, both of Washington, D. C., for
appellees.

SMYTH, Chief Justice. This is an appeal from a decision of the
Patent Office awarding priority in three interference proceedings—to
Manchester and Spooner in No. 1262, and to Manchester alone in Nos.
1263 and 1264. Engle is the senior party, having filed some two months
before the others. The subject-matter of each interference is so close-
ly related to that of the others that the three have been submitted on
the same record, and they shall be disposed of as one case.

The invention concerns an electric battery, and the claims of the is-
sue are illustrated by the following:

No. 1262.

1. An electrode for batteries composed of cupric oxide (CuO) and cuprous
oxide (Cu₂O).

5. An electrode for batteries formed of cupric oxide and cuprous oxide in
the form of scales of appreciable size bonded together and compressed into a
dense hard mass.

11. The process of producing a copper oxide electric battery element con-
sisting in forming flakes of black or cupric oxide of copper carrying therewith
portions of unoxidized copper and treating the said flakes to eliminate any
unctuous matter therefrom, thoroughly mixing the flakes carrying the por-
tions of unoxidized copper with a binder and pressing the mass thus pro-
duced into a desired shape so that the black or cupric oxide of copper and por-
tions of the metallic copper will be regularly distributed throughout the body
of the pressed mass, then subjecting the compressed mass to the action of heat
until the compressed mass is cured and the binder reduced to a minimized
residuum, then placing the compressed mass carrying the minimized residuum
of the binder in the oven and subjecting the said mass to a high degree of heat
to first burn out the binder residuum and next to change the metallic copper
within the body of the mass of cuprous oxide removing the mass now com-
posed of cupric and cuprous oxides of copper from the baking oven and again
compressing the same while red with heat, and finally allowing the plate to
cool in the air.

⊞═⊳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

### No. 1263.

1. A gelatinous alkaline electrolyte for primary batteries formed of an alkaline hydroxide of approximately 28° gravity Baume with which vegetable starch is combined at a temperature of approximately 180° F. and in quantity substantially less than that required to gelatinize an equal quantity of water.

### No. 1264.

1. The herein described process of making an alkaline gelatinous electrolyte, consisting in thoroughly mixing a caustic alkaline solution comprising about one part of starch to ninety parts of the solution and thoroughly stirring the two components, subjecting the mixture of alkaline solution and starch to a degree of heat less than that required to boil the mixture to avoid the liberation of the constituents of starch that would have a tendency to harden the electrolyte, and allowing the mixture to cool to a pouring consistency.

Appellant was successful before the Examiner of Interferences and the Board of Examiners, but failed before the Assistant Commissioner. Originality is the crux of the dispute, and the question for decision is one of fact. Manchester and Spooner, being junior parties, must overcome the claim made by Engle, or they cannot succeed. All the parties worked together in the same house upon the invention. Manchester and Spooner assert that they were partners with Engle; that he was merely a promoter and legal adviser, but supplied none of the inventive ideas, while Engle says that Manchester and Spooner were employés of his; that he furnished the funds necessary to carry on the work, and also the ideas embodied in the invention.

The testimony is a tangled web of contradictions; none the less there are certain things in it which stand out prominently and point to the right direction for the investigator. One of the witnesses called by Manchester and Spooner refers to the battery throughout his testimony as Engle's and speaks of Spooner as Engle's workman, though he later tried to change his testimony on the latter point. Spooner, without dissent, witnessed a contract, after it had been read to him, in which Engle was represented as the inventor, and both Manchester and Spooner knew that Engle was going to file an application for a patent on the invention, but neither objected. Indeed, Engle was distinctly asked in the presence and hearing of Manchester at the time his application for a patent was being prepared as to whether he (Engle) was the sole inventor, or a joint inventor with Manchester, and he answered that he was the sole inventor. Manchester did not deny it, but acquiesced in the answer by his silence. Perhaps this conduct on the part of Manchester and Spooner may be explainable in harmony with their claim of inventorship. They attempt to show that it is by saying that they were misled by Engle, who, they assert, gave them to understand that he was the proper one to make the application, and that he would, after having obtained a patent, recognize their interests in it. This may be correct, but it is difficult to accept it, for it means that they, knowing they were the inventors and that Engle was not, made no protest against his pretensions. They would have to be far less intelligent than the record shows them to be before we could believe that they did not understand that a person who is not an inventor cannot, under the statute, obtain a patent. These things, in connection with others in the record, tend to establish with much force that

Manchester and Spooner have not sustained the burden of proof imposed upon them by the law. With great care the Examiner of Interferences and the Board of Examiners have analyzed the testimony in their respective opinions. We are entirely satisfied with their reasoning, and therefore the decision of the Assistant Commissioner must be reversed, and priority of the subject-matter involved in the three interferences awarded to Engle.

Reversed.